

# IN THE
# TENTH COURT OF APPEALS

## No. 10-19-00356-CV

## IN THE INTEREST OF J.F.-G., A CHILD

**From the 74th District Court
McLennan County, Texas
Trial Court No. 2017-1734-3**

## MEMORANDUM  OPINION

In two issues, Appellant D.F. ("Father") challenges the trial court's order terminating his rights to his child, J.F.-G. ("Julie").[1]  We affirm.

### *I. Background*

Father married M.G. ("Mother") shortly after Julie was born.  Before Julie's second birthday, Father was convicted of robbery and sentenced to eight years' incarceration in the Texas Department of Corrections, Institutional Division.  Shortly after Father was incarcerated, Mother entered into a relationship with M.C. ("Boyfriend"), with whom she

---

[1] We refer to the parties by aliases.  *See* TEX. R. APP. P. 9.8.

had three additional children.[2]  The Department of Family and Protective Services (the "Department") investigated Mother and Boyfriend on five separate occasions.  In 2017, the children were removed from Mother's custody and placed in foster care after Boyfriend was involved in a car accident that resulted in the death of his sixteen-year-old son and caused serious injuries to Julie.  The Department determined that Mother had reason to believe that Boyfriend was under the influence of alcohol and/or drugs when she allowed Julie to get into the car with him.  Boyfriend was arrested for intoxication manslaughter and was subsequently sentenced to a twenty-year term of incarceration.  Prior to the disposition of that case, Boyfriend was on bond.

The children were returned to Mother on a monitored basis in May 2018.  One of the requirements for the children's return was that they have no contact with Boyfriend.  In August 2018, Department personnel observed Mother and Boyfriend together with the children in a vehicle.  The children were again removed from Mother's custody and placed in foster care where they remain.

Father was paroled in March of 2019 to his mother's home in Tyler.  Mother moved to Tyler to reside with Father within a week of his parole.

After a final hearing on September 4, 2019, the trial court ordered termination of the parental rights of Father, Mother, and Boyfriend to all of the children.  The trial court

---

[2] The record reflects that the fourth child was born and removed from Mother's custody while this termination action was proceeding.  The fourth child was placed in a different foster home than the three older children and is the subject of a separate termination action.

determined that Father had violated § 161.001(b)(1)(E) of the Family Code and that termination was in Julie's best interest. Mother and Boyfriend did not appeal the trial court's termination order.

## II. Issues

Father presents two issues with several subparts. In his first issue, Father contends that there is no evidence or the evidence is factually insufficient to prove that he violated § 161.001(b)(1)(E). Father contends that the Department failed to prove that he engaged in conduct or knowingly placed Julie with persons who engaged in conduct which endangered Julie's physical or emotional well-being. Specifically, Father argues that the Department presented no evidence that he had knowledge that placing Julie with Mother would place Julie in danger from her environment or from others. Father also asserts that there was no evidence that Boyfriend drove the children after the Department became involved. Finally, Father argues that the trial court erred in admitting hearsay testimony regarding statements Julie and one of her half-sisters made to the Department investigator.

In his second issue, Father argues that there is no, or factually insufficient, evidence to prove that termination is in Julie's best interest. Father argues that the *Holley* factors weigh in favor of not terminating his parental rights.

### III. Burden of Proof at Trial

In a proceeding to terminate the parent-child relationship brought under § 161.001, the Department must establish by clear and convincing evidence two elements: (1) that one or more acts or omissions enumerated under § 161.001(b)(1), termed a predicate violation, were committed; and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). Proof of one element does not relieve the Department of the burden of proving the other. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014) (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d at 847.

### IV. Standard of Review

As noted, Father argues that there is no evidence and factually insufficient evidence to support termination of his parental rights. "Our traditional legal sufficiency—or 'no evidence'—standard of review upholds a finding supported by '[a]nything more than a scintilla of evidence.'" *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (quoting *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could

reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see In re C.H.*, 89 S.W.3d at 25.

When no findings of fact or conclusions of law are filed following a bench trial, the trial court's judgment implies all findings necessary to support it. *See In re D.Z.*, 583

S.W.3d 284, 295 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing *Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex. 1996)); *see also In re Marriage of Price*, No. 10-14-00260-CV, 2015 WL 6119457, at *3 (Tex. App.—Waco Oct. 15, 2015, no pet.) (mem. op.). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues. *In re G.B. II*, 357 S.W.3d 382, 385 n.1 (Tex. App.—Waco 2011, no pet.).

We give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole judge "of the credibility of the witnesses and the weight to give their testimony." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied*)*. The factfinder may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). Although a factfinder is free to disbelieve testimony, "in the absence of competent evidence to the contrary, it is not authorized to find that the opposite of the testimony is true." *In re F.E.N.*, 542 S.W.3d 752, 765 (Tex. App.—Houston [14th Dist.] 2018, pet. denied, 579 S.W.3d 74 (Tex. 2019)).

### V. Discussion

A. Predicate Finding Under Subsection (E). Termination under § 161.001(b)(1)(E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re J.R.*, 501 S.W.3d 738, 743 (Tex. App.—Waco 2016, no pet.). While "endanger" requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Boyd*, 727 S.W.2d at 533.

When termination is based upon subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's or another's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *see also In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). A factfinder properly may consider actions and inactions occurring both before and after a child's birth and also may consider conduct occurring both before and after the Department removed a child from the home. *F.E.N.*, 542 S.W.3d at 763-64; *see also In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

A specific danger to a child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *A.L.H.*, 515 S.W.3d at 91. Additionally, a parent's

past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *F.E.N.*, 542 S.W.3d at 764; *A.L.H.*, 515 S.W.3d at 92. Among the types of actions or omissions constituting evidence meeting this standard are criminal activity, convictions, and incarceration. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.) ("Evidence of criminal conduct, convictions, imprisonment and its effects on a parent's life and ability to parent may establish an endangering course of conduct.").

Because there are no findings of fact and conclusions of law, we are unable to determine whether the trial court based termination on acts of Father that endangered Julie or on the fact that Father placed Julie with others who engaged in endangering acts. If the former, then there was sufficient evidence that Father engaged in a course of conduct that endangered Julie's physical and emotional well-being. Father was involved in criminal activity both before and after Julie's birth. Prior to his eight-year sentence for robbery, Father also served an eighteen-month sentence for a controlled substance offense. The criminal acts that led to Father's conviction for robbery occurred after Julie

was born. The trial court could have inferred from Father's repeated criminal activity and numerous convictions that such activity would occur in the future.

The record before the trial court reflected that Father has behaved in an exemplary fashion since his parole. Father has had no dirty drug tests; he has paid his parole fees; he has obtained employment (working two jobs); he has assisted Mother in paying off significant traffic fines; he has obtained housing that would accommodate him and all of Mother's children; and he has not violated the terms of his parole. There is nothing in the record to indicate that Father committed any serious infractions or other disciplinary problems while incarcerated, other than his admission that he was involved with a prison gang during the first couple of years of his imprisonment. Father additionally began taking classes as early as 2014 to prepare for his release. The classes included cognitive intervention, parenting, and anger management. In January 2018, Father also enrolled in another prison program that included classes to help him transition to life outside of prison, including prevention of alcohol and drug addiction, lifestyle changes, and managing a successful parole. Father completed the majority of the program before he was paroled. After receiving notice of the potential termination, Father requested the appointment of counsel and the issuance of a bench warrant so he could attend court proceedings. Father participated in the proceedings as best he could considering his incarceration. Father has accompanied Mother on all of the twice-a-month supervised

visitations with the children in Temple. Mother and Father have also made arrangements for assistance from Father's family in assisting with the children.

The trial court could have discounted Father's exemplary behavior since his parole as he had only been out of jail approximately six months at the time of trial. "Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied).

There is also evidence in the record from which the trial court could conclude that Julie would be placed in a situation that endangered her physical and emotional well-being. "In a suit to involuntarily terminate the rights of an imprisoned parent under subsection (E), mere imprisonment will not, standing alone, constitute engaging in conduct that has the effect of endangering the physical or emotional well-being of the children." *In re C.D.E.*, 391 S.W.3d 287, 296 (Tex. App.—Fort Worth 2012, no pet.) (citing *Boyd*, 727 S.W.2d at 533-34)); *see also Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (imprisonment alone not conduct endangering physical or emotional well-being of child). If the evidence, including imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding under § 161.001(b)(1)(E) is supportable. *C.D.E.*, 391 S.W.3d at 296; *see also In re S.T.*, 263 S.W.3d 394, 401 (Tex. App.—Waco 2008, pet. denied) ("[E]vidence of imprisonment may be considered with other evidence tending to establish that the parent has engaged in a course of conduct which

has the effect of endangering the child, and collectively such evidence can support a finding to this effect.").

Father testified that he intended for Mother and all of the children to live with him as a family. The trial court was justified in taking into consideration Mother's history, in addition to Father's prior criminal history, when determining whether Julie would be placed in a situation that endangered her physical and mental well-being.

In order to find that Father was intending to place Julie in a situation that would constitute a danger to her physical and/or mental well-being, the trial court was required to find that Father knew of the danger involved. *See F.E.N.*, 542 S.W.3d at 764; *see also In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (scienter required only when parent places child with others who engage in endangering acts). Knowledge may be established through proof of a parent's future course of conduct. *See In re L.V.B.D.*, No. 04-19-00632-CV, 2020 WL 690634, at *3 (Tex. App.—San Antonio Feb. 12, 2020, no pet. h.) (mem. op.) (mother's decision to violate service plan and move into home where child would have been at risk supported trial court's inference that mother's future conduct could endanger child); *see also In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A fact finder may measure a parent's future conduct by her past conduct and determine that it is in a child's best interest to terminate her parental rights.").

There is nothing in the record to indicate that Father was notified of any of the prior Department investigations into Mother and Boyfriend or that he otherwise knew of the conditions in which Julie was living until after the children were removed in 2017. Both Mother and Father denied that Mother informed Father of any of the Department's previous investigations, although she did tell him about her relationship with Boyfriend. However, Father became aware of the situation at least by May 2017 when he was notified of the accident injuring Julie. After that time, Father was served with notice of the termination suit, as well as receiving notifications of all other actions taken by the Department, including the return and second removal of the children, as well as progress reports regarding Mother's positive drug tests and Mother allowing the children to have contact with Boyfriend. The records provided to Father would also have informed him of the prior Department investigations regarding Mother and Boyfriend.

The record before the trial court reflects that Mother decided to cohabitate with Boyfriend, along with Julie, even though Boyfriend was on parole for a controlled substance offense. During the course of her relationship with Boyfriend, Mother had three additional children. Mother stayed with Boyfriend through numerous previous Department investigations of allegations of neglectful supervision of, and possible physical harm to, the children due to the presence of readily accessible drugs and weapons in their residence.

A 2012 investigation by the Department, that was ultimately determined to be unfounded, was instigated by reports of guns and drugs in the residence along with filthy living conditions. In 2013, police executed a search warrant at the home in which Mother and the children were living with Boyfriend. The house was in terrible condition—filthy with animal feces and exhibiting the presence of rodents. Crack cocaine was found in areas of the home that were accessible to Julie. That report was resolved with the family being referred to Family Based Safety Services. In 2014, the Department opened another investigation after Boyfriend tested positive for cocaine. Boyfriend was also alleged to be neglectful in his supervision of Julie and her sister while Mother was in the hospital having her third child. The report again noted filthy housing conditions. The allegations of neglectful supervision were eventually ruled out. Boyfriend was requested to remove himself from Mother's residence by his parole officer, and the Department noted that Boyfriend was no longer living in the residence. The Department received another report of neglectful supervision in 2016 that was sustained as to Boyfriend but ruled out as to Mother. The final investigation in 2017 was initiated after Boyfriend caused his son's death and serious injuries to Julie. When questioned regarding Julie's presence in the car at such a late hour, Mother told Department workers that Boyfriend picked up seven-year-old Julie at Julie's request at 10:00 p.m. because Julie was hungry. When Boyfriend's blood was tested after the accident, he was found to have a .107 blood alcohol content.

Mother later defended Boyfriend's involvement in the wreck by telling the caseworker that the son was going to die of Crohn's disease anyway.

Shortly after the wreck, Mother tested positive for cocaine. Mother tested positive again for cocaine in December 2017.

The children were removed from Mother's custody in May 2017 but were eventually returned to her on a monitored basis. One of the requirements for the children's return was that Mother allow no contact between the children and Boyfriend other than at approved supervised visitations. In 2018, the children were again removed from Mother's custody after a Department investigator saw Mother and the children getting into a car with Boyfriend.[3] The Department had additionally received information that Boyfriend was using and selling drugs out of Mother's house. The caseworker believed that Mother continued her relationship with Boyfriend until he was sent to prison in 2019, after which time Mother moved in with Father.

While Mother testified that she believed the positive drug tests were "false" positives, the trial court was free to disbelieve her testimony. The trial court was also free to discount the excuse Mother provided Father, and Father's belief in it, that she must

_____

[3] As noted, Father argues that there was no evidence that Boyfriend drove the children around after the children were returned to Mother's custody and that the trial court erred in permitting hearsay by the children regarding their contact with Boyfriend. However, the Department investigator testified that she personally observed Mother and the girls in a vehicle with Boyfriend. The investigator further testified that Mother admitted that she allowed such contact because she loved Boyfriend. This was sufficient for the trial court to determine that Mother allowed contact between Boyfriend and Julie without relying upon the hearsay testimony of the children or without finding that Boyfriend was actually driving them around.

have come into contact with the cocaine from the number of drug users who frequented the convenience store where she worked. Criminal drug abuse and knowledge that the child's other parent abused drugs is an action or omission that is evidence of endangering conduct. "Drug abuse and its effect on the ability to parent can present an endangering course of conduct." *In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591 at *6 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.). "Drug use can endanger a child 'when the environment creates a potential for danger that the parent is aware of but disregards.'" *Id*. (quoting *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.)).

> A parent's illegal drug use and drug-related criminal activity may . . . support a finding that the child's surroundings endanger his or her physical or emotional wellbeing. And "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." . . . A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.

*In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) (citations omitted); *see also In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied).

There was no indication that Mother tested positive for controlled substances after she moved to Tyler, and the recent sobriety of a parent is entitled to significant weight. *J.J.W.*, 2019 WL 1827591, at *7. However, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug

use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *see also In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *4 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.).

The evidence of Mother's drug use, and Father's knowledge of it, could constitute the basis for termination under subsection (E). Although Father may not have been aware of Mother's drug abuse prior to the notification of Julie's removal from the home in May of 2017, he certainly became aware of it after that point when he was served with notice of the termination suit and began receiving all of the reports and papers filed in the case. Father also appeared at various hearings after he was bench warranted back to the McLennan County Jail in March 2018. Father additionally heard all of the testimony related to Mother's behavior at the final termination trial, but remained adamant in his desire to keep the family together.

A review of the record reflects that the evidence was legally and factually sufficient to support the trial court's determination that Father engaged in conduct described in subsection (E). We overrule Father's first issue and all its subparts.

B.  Best Interest of the Child.  If the trial court determines that a parent has violated one of the predicate acts under § 161.001, the trial court must then determine whether terminating a parent's rights is in the best interest of the child. "There is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); TEX. FAM. CODE ANN. § 153.131(b).  Prompt and

permanent placement of a child in a safe environment is also presumed to be in the child's best interest. *In re C.A.*, 579 S.W.3d 140, 145 (Tex. App.—Amarillo 2019, pet. denied); TEX. FAM. CODE ANN. § 263.307(a). The focus of the best interest analysis is what is best for the child, not what is best for the parent. *In re C.A.*, 579 S.W.3d at 145.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply indicative of factors that have been or could be pertinent. *Id.* at 372. The court does not require evidence on each factor in order to make a valid finding as to the child's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). "[A] single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child." *Id.* Evidence establishing one of the predicate acts under § 161.001(b)(1) also may be relevant to determining the best interest of a child. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *C.H.*, 89 S.W.3d at 27-28).

In this case, the same evidence that supports the trial court's finding of a predicate violation under § 161.001(b)(1)(E) also supports the trial court's finding that termination is in Julie's best interest.

### The Desires of the Child

The only evidence in the record of Julie's desires is provided through the testimony of Mother and Father. Mother testified that Julie wants to return to Mother. Mother also testified that Julie has a great connection with Father and likes him. Father testified he believes all of the children want to be in the home with him and Mother which is, in his opinion, in the children's best interest.

### The Emotional and Physical Needs of the Child Now and in the Future
### The Emotional and Physical Danger to the Child Now and in the Future

Despite Julie's desires, the evidence before the trial court supported a finding that Julie's emotional and physical needs had not been met and would not be met in the future and Julie had been in emotional and physical danger in the past and would also be in such danger in the future if she were returned to Father's custody.

Father has been incarcerated the majority of Julie's life. Father and Mother both testified that he communicated with Julie through cards, letters, and the occasional telephone call. Mother testified that she took Julie to see Father at least once during his incarceration, but she stopped visiting when Julie was around four years old. Mother additionally testified that her children called Boyfriend "Dad" until she got back together with Father, who they now call "Dad." Father is, in effect, a stranger to Julie.

Although, as noted, a parent's imprisonment is not by itself a ground for termination, a parent's imprisonment can negatively impact a child's emotional well-being. *See In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Mother's drug use is also the type of behavior that can negatively impact a child's emotional well-being. *In re D.M.*, 58 S.W.3d at 814. A parent's involvement in criminal conduct endangers the physical and emotional well-being of a child due to the potential for incarceration. *See In re I.D.G.*, 579 S.W.3d 842, 854 (Tex. App.—El Paso 2019, pet. denied); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").

Father's criminal history, mother's drug use, and mother's history of failing to protect her children provided sufficient evidence for the trial court to determine that they had not met Julie's emotional or physical needs in the past and that returning Julie to them would place her in physical and emotional danger in the future.

***The Parental Abilities of the Individuals Seeking Custody and the Programs Available to Assist These Individuals***

In reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children. *I.D.G.*, 579 S.W.3d at 854. A factfinder "may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future." *J.D.*, 436 S.W.3d at 118. "Evidence of a recent improvement does not

absolve a parent of a history of irresponsible choices." *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied). The record clearly shows Mother's inability to meet Julie's physical and emotional needs.

Father has had limited contact with Julie during her life due to his incarceration. As noted, Father is basically a stranger to Julie. There is nothing in the record to indicate that Father has other children, although he testified that he had brothers and sisters he helped tend while growing up. Father additionally took parenting classes during his imprisonment. However, Father has no experience acting as a father to a nine-year-old girl.

While Father's parenting skills are slim, Mother has shown almost no true parenting skills in regard to Julie. The first few years of Julie's life were spent in filthy, vermin-infested drug houses. Mother allowed Julie to associate with felons and drug traffickers. Mother also was a terrible role model for Julie by flouting court orders to keep Julie away from Boyfriend.

***The Plans for the Child by the Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement***

Father's plans for Julie were to raise her in a loving home and to help her achieve success in life. When questioned as to what he wanted for Julie, Father responded: "Whatever she want to be in life. To be at home with her Family. To be raised right. To become somebody, maybe one of y'all that's sitting in one of these suits in here." Father

also testified that he planned to continue working, pay off Mother's fines and his parole fees, get his driver's license back, and buy a car.

After an inquiry from the trial court, the court was informed that the children have been in the same foster placements since they were removed in 2018. Although the youngest child is in a separate placement, the foster family with whom Julie is residing has expressed interest in adopting all four children. The permanency reports prepared for the trial court note that the children appear to have adjusted well to their foster home. The caseworker testified that the children were "doing great" in their foster placements and that there had been no concerns or issues with the placement.

The factfinder may compare the parent's and the Department's plans for the child and consider "whether the plans and expectations of each party are realistic or weak and ill-defined." *J.D.*, 436 S.W.3d at 119-20. A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. *In re B.H.R.*, 535 S.W.3d 114, 124 (Tex. App.—Texarkana 2017, no pet.). The

goal of establishing a stable, permanent home for children is a compelling state interest. *Dupree*, 907 S.W.2d at 87.

There was sufficient evidence for the trial court to determine that the Department's plan to place Julie with the same adoptive parents as her siblings would provide her a permanent stable home that she would not find with Father.

***Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship Is Not a Proper One and Any Excuse for the Acts or Omissions of the Parent***

As noted, Father's intention is to place Julie in the custody of Mother, whose rights have been terminated. The trial court could conclude that the excuses Mother offered for her positive drug tests and her continued relationship with Boyfriend, and Father's belief in her excuses, were not credible. The trial court could conclude from this that Father was not considering Julie's best interests and that the parent-child relationship is not a proper one.

Although, as also noted, Father has exhibited exemplary behavior since being paroled, the focus in a termination case such as this is the best interest of the child, not the parent. *O.L. v. Texas Dep't of Family & Protective Servs.*, 460 S.W.3d 640, 648 (Tex. App.—El Paso 2014, pet. denied).

Viewing all of the evidence in relation to the *Holley* factors, we hold that a reasonable factfinder could have reasonably formed a firm belief or conviction that termination was in the child's best interest. The evidence is, therefore, factually and

legally sufficient to establish that termination was in Julie's best interest. We overrule

Father's second issue and all its subparts.

### VI. Conclusion

Having overruled both of Father's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,*
    Justice Davis, and
    Justice Neill
Affirmed
Opinion delivered and filed March 23, 2020
[CV06]

    *(Chief Justice Gray dissents. A separate opinion will not issue. He notes, however, that he would reverse the order of termination of parental rights as to the appellant and remand this proceeding for a new trial as to the appellant only. Specifically, Chief Justice Gray does not find that the evidence is factually sufficient to establish by clear and convincing evidence that the appellant engaged in conduct that violated Subsection E, the predicate violation resulting in the termination of his parental rights. Chief Justice Gray notes that while the mother and her boyfriend engaged in a lot of conduct that endangered the child, that conduct cannot properly be attributed to the appellant, who was incarcerated at the time, or provide a basis for termination of appellant's parental rights. With these comments Chief Justice Gray respectfully dissents from the Court's judgment in this proceeding.)

